MEL:PAS
F. #2019R00501

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF (1) A BLU PRODUCTS INC. CELLULAR TELEPHONE MODEL V5, (2) A BLACK IPHONE WITH DARK BLUE CASE AND (3) AN ORANGE IPHONE WITH A CRACKED SCREEN | **APPLICATION FOR A SEARCH WARRANT FOR ELECTRONIC DEVICES**<br><br>Case No. 20-MJ- 151 |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, KYLE CAPPELLO, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices further described in attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been for approximately four years.  I have been involved in the investigation of cases involving racketeering, sex trafficking, violent crimes, armed robberies, firearms offenses and narcotics trafficking offenses.  My training and experience has also included investigating crimes facilitated by the use of electronic communication devices, such as the cellular telephones further described herein.

3.      The information in this affidavit comes from my personal involvement in the investigation, as well as a review of records of the FBI and New York City Police Department ("NYPD") including video footage, reports of victim statements, review of social media materials and conversations with other law enforcement officers.  Unless specifically indicated, all conversations and statements described in this affidavit are related in sum and substance and in part only.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of sex trafficking, in violation of Title 18, United States Code, Section 1591, sex trafficking conspiracy, in violation of Title 18, United States Code, Section 1594(c), promotion of prostitution, in violation of Title 18, United States Code, Section 1952(a)(3), and drug trafficking, in violation of Title 21, United States Code, 841, have been committed by Gladimir Thomas, also known as "Sleep" and "Sleep Boss," Ronald Thomas, also known as "Roco" and "Roco Da Boss," and others.  There is also probable cause to search the devices described in Attachment A for evidence of these crimes, as described in Attachment B.

## SUBJECT DEVICES

5.      The property to be searched consists of the following: (1) a BLU Products Inc. Cellular Telephone Model V5 ("Subject Device 1"), (2) a Black iPhone with Dark Blue Case ("Subject Device 2") and (3) an Orange iPhone with a Cracked Screen ("Subject Device 3") (collectively, the "Subject Devices").  Photographs of the Subject Devices are included in

Attachment A.  The Subject Devices are currently located in the custody of the FBI in the Eastern District of New York.

6.      On January 2, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging Gladimir Thomas and his brother, Ronald Thomas, with sex trafficking, sex trafficking conspiracy and promotion of prostitution.  United States v. Gladimir Thomas et al., 20-CR-02 (RRM).  That same day, the Honorable Steven L. Tiscione, United States Magistrate Judge for the Eastern District of New York, issued a warrant for the arrest of Gladimir Thomas.  On January 2, 2020, Gladimir Thomas was arrested in the vicinity of 794 Washington Avenue in Brooklyn, New York.  At that time, Gladimir Thomas was the only person in the vehicle, and he provided oral consent to search the vehicle.  During a search of the vehicle, Subject Device 1 was recovered from the inside of the center console, and Subject Device 2 was recovered from on top of the center console. Subject Device 3 was recovered from Gladimir Thomas's person.

7.      The applied-for warrant would authorize the forensic examination of the Subject Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

8.      On or about October 17, 2018, the National Human Trafficking Hotline ("NHTH") received a tip, subsequently provided to the FBI, indicating that brothers Gladimir Thomas and Ronald Thomas were involved in sex trafficking of minor and adult female victims.  The tip listed an address associated with Gladimir Thomas of 173 Classon Avenue, Apartment 1L, Brooklyn, New York.

9.      I subsequently spoke with NYPD officers who were previously familiar with Gladimir Thomas and Ronald Thomas and confirmed that Gladimir Thomas and Ronald Thomas are brothers.  I also reviewed the NYPD database regarding known addresses associated with Gladimir Thomas and Ronald Thomas.  I identified that on or about November 24, 2018 and on or about January 5, 2019, at 173 Classon Avenue, Apartment 1L, Brooklyn, New York, a female, age 19, was arrested for agreeing to have sex with an undercover NYPD officer.

10.     On or about January 11, 2019, the Honorable Jill Konviser, Justice of the New York State Supreme Court, Kings County, signed a warrant authorizing a search of Ronald Thomas's Facebook account, which utilized the Facebook moniker "Roco Da Boss."  In addition, that warrant authorized the search of Ronald Thomas's Samsung galaxy cellular telephone as well as his Instagram account, which utilized the Facebook moniker "Roco Da Boss."[1]

11.     Based upon my review of the search warrant return for Ronald Thomas's Facebook account, I further learned that a female victim ("Jane Doe 1") sent a series of messages to Ronald Thomas through "Facebook Messenger," indicating that she had engaged in prostitution at his direction and out of fear of him for a period of time.  I further

---

[1] The facts and circumstances justifying the search warrant for the two social media accounts and the cellphone were from a shooting that occurred on or about August 12, 2017.  This shooting is the basis of a pending indictment in Kings County, New York charging Ronald Thomas with attempted murder and other related firearms offenses.

learned that Gladimir Thomas also directed Jane Doe 1 to engage in prostitution.  For

example, on June 4, 2018, Jane Doe 1 wrote to Ronald Thomas:

> Jane Doe 1:   you manipulated lied and beat me to accept you
> bringing her into my home

> Jane Doe 1:   for the love of money

> Jane Doe 1:   you pimped me out Roco just like your brother did

12.      On or about October 16, 2018, Jane Doe 1 sent another Facebook message to

Ronald Thomas regarding Ronald Thomas and Gladimir Thomas's sex trafficking–related

activities.  Specifically, Jane Doe 1 wrote:

> Jane Doe 1:   I feel like if I never met your brother none of this
> would of ever happened.  I was really pimped
> out and used.  I trusted in you for years I know that's
> your blood. I never looked at him in that way.

> *      *      *

> Jane Doe 1:   Then you hurt me Roco maybe because you ride
> for your bro looked at me as a hoe because of me
> being on drugs lost I trusted in you.

13.      I know based upon my training and experience, involvement in this

investigation and consultation with other law enforcement agents that sex traffickers will

often target victims who are addicted to narcotics.  These traffickers will also use narcotics to

keep victims involved in sex trafficking as both a reward for sexual activities and as a

potential threat that, if the victims refuse to continue to earn money for the trafficker, the

trafficker will cease to provide the victims narcotics.  I further know that narcotics are

provided to sex trafficking victims to help facilitate commercial sex acts that are otherwise

known as "dates."  Furthermore, in the NHTH tip, the caller reported that Gladimir Thomas

5

would recruit potential victims at strip clubs by giving them narcotics and would make his victims overdose in order to take them to his residence.

14.     On or about November 3, 2018, Jane Doe 1 sent a Facebook message to Ronald Thomas regarding Ronald Thomas and Gladimir Thomas's sex trafficking–related activities.  Specifically, Jane Doe 1 wrote:

> Why did you choose me to violate over and over and over.
> What I did seriously.  Your brother pimped me out.  I was
> sooooo crazy to think that I can find love in his blood brother.  I
> really bugged out.  Believe everything you lies everything.
> Chose to ride for you for yeaaaaaaars.  Now you know the real
> truth.  You still choose to ignore me and violate.  A bag do you
> know how much you took from me.  Do you even understand
> Roco seriously.  I gave you my heart my last.  I know I made
> crazy mistakes being high and not in my fight mind but you
> holding me accountable for that.  Do you know how it feels to
> be violated and left for dead by someone you rode for years.  If I
> was still getting money for you it would have been all good
> though.  I never wanted to be a prostitute.  I did it out of fear.  I
> just wanted to be a regular sweet woman to you . . . . You
> seriously pimped me out you seriously never seen I was a single
> mom broken and struggling with a son.

15.     On or about November 5, 2018, Jane Doe 1 sent a Facebook message to Ronald Thomas regarding Ronald Thomas and Gladimir Thomas's sex trafficking–related activities.  Specifically, Jane Doe 1 wrote:

> Forget it I need to get it together I'm bugging chasing you and
> crying like you family relative Every One done violated me.
> You right I'm coo coo for being your inbox.  You know I'm a
> kind hearted person.  You definitely know I'm a good woman.  I
> don't got to prove nothing to you nomore.  You doing you cool.
> Time I start really letting go and doing me.  You relatives
> including you pimp me out.  You had two babies on me one you
> made me watch grown in my home.  Tatoo that happened not
> being in my right mind will not hold me back.  I'm getting a

tatoo removal and off this nonsense.  You and your brother
work hand in hand.

16.     Based upon a review of Facebook messages it appears that Ronald Thomas

and Gladimir Thomas names are tattooed on Jane Doe 1.

17.     On or about February 16, 2019, NYPD officers observed Gladimir Thomas

driving backwards down a one-way street in a reckless manner.  Officers conducted a felony

traffic stop and observed Gladimir Thomas in the driver's seat along with a woman in the

passenger seat.  The officers detected a strong odor of marijuana and discovered that

Gladimir Thomas was driving with an expired license.  A search of the car officers recovered

two large bags of marijuana.  Both Gladimir Thomas and the female passenger were arrested.

18.     During a subsequent search at the police station, Gladimir Thomas refused to

be searched and was discovered hiding a bag containing additional narcotics.  Gladimir

Thomas also fought with the arresting officer and bit both of the officer's hands, grabbed the

Ziploc bag and swallowed the bag.  Gladimir Thomas continued to fight with the arresting

officer causing a ten-inch laceration to the officer's leg and other injuries.  Recovered from

the floor of the holding cell where Gladimir Thomas was being held were partial tablets of

Xanax, ecstasy and capsules of MDMA as well as ripped up plastic bags and powder.  This

conduct was the basis of an indictment in Kings County, New York charging Gladimir

Thomas with criminal possession of a controlled substance with the intent to sell, assault on a

police officer and other related offenses.  Gladimir Thomas subsequently pled guilty to

misdemeanor assault in the third degree.

19.     At the time of his arrest, NYPD also seized a cellular telephone, with phone

number (646) 552-4221, from Gladimir Thomas.  On or about February 27, 2019, the

Honorable Danny K. Chun, Justice of the New York State Supreme Court, Kings County,

signed a warrant authorizing a search of that phone.  I reviewed the phone's contents and

identified evidence in the phone, including but not limited to, approximately 700 visits to

Backpage.com and multiple email accounts including, but not limited to,

bbankhollywood@gmail.com and Livelifehavefun07@yahoo.com.

20.     I conducted a review of historical Backpage.com posts and identified that

bbankhollywood@gmail.com and Livelifehavefun07@yahoo.com were utilized in multiple

suspected commercial sex act advertisements in or about August 12, 2016 through in or

about April 4, 2018.

21.     I identified that on or about January 16, 2018, an advertisement was posted on

Backpage.com with the associated account registered to the email address of

Livelifehavefun07@yahoo.com.  The Backpage.com advertisement included what appeared

to be women in scantily clad clothing and in sexually suggestive poses as well as text

including the following descriptions: "limited time only," "the bext s3rvice ever," "no

rushing," "super freaky," "no games," "good hygiene is a MUST!!!," "no thugs or

hoodlums."  I reviewed the usage of Livelifehavefun07@yahoo.com in Backpage.com

advertisements and further identified that the first usage of this email account was on or

about August 12, 2016 and that it was last used on Backpage.com on or about February 19,

2018.

8

22.    I also identified that on or about March 22, 2018, an advertisement was posted on Backpage.com with the associated account registered to the email address of bbankhollywood@gmail.com.  The Backpage.com advertisement included what appeared to be women in scantily clad clothing and in sexually suggestive poses.  I reviewed the usage of bbankhollywood@gmail.com in Backpage.com advertisements and further identified that the first usage of this email account was on or about October 6, 2016 and that it was last used on Backpage.com on or about January 5, 2018.

23.    There were approximately 85 suspected commercial sex act advertisements on Backpage.com with the contact information of Livelifehavefun07@yahoo.com, Bbankhollywood@gmail.com and Carmensandiego784@yahoo.com.

24.    My review of Gladimir Thomas's phone also revealed evidence of his involvement in the distribution of marijuana.  I reviewed photographs on Gladimir Thomas's cellphone and identified numerous photos of what appeared to be marijuana.  In one photo, the amount of apparent marijuana is more consistent with possession with the intent to distribute then mere possession for personal use.  There was also a photo of what appears to be marijuana in smaller individual baggies, as well as a scale, which I know to be used in the weighing and packaging of controlled substances for sale.  In addition, I also identified what appeared to be an Oxycodone pill (a Schedule II narcotic) and other pills that appear to be Endocet (a Schedule II narcotic).  Finally, I identified numerous text message conversations where Gladimir Thomas discussed illegal narcotics.  In particular, there is a conversation between Gladimir Thomas and an unknown individual in which the individual told Gladimir Thomas that someone was looking to buy a "zip" from Gladimir Thomas and that it is the

9

same person as yesterday.  Based on my knowledge and experience, a "zip" is street

terminology for an ounce of narcotics.  In another conversation, Gladimir Thomas tells a

different unknown individual that  ". . . I got bud missing out my pound I left it in the front

like 3 Or 4 zips I know how I tie my bags on some Gee shit u can't get nothing from me send

my bread to I need my shit."  Based on my knowledge and experience, the term "bud" refers

to marijuana.

      25.     During the course of the investigation, law enforcement interviewed multiple

witnesses who identified a woman ("Jane Doe 2"), as a woman who was working in

prostitution for Gladimir Thomas.  A review of Gladimir Thomas's jail calls, since he has

been incarcerated at the Metropolitan Detention Center on January 2, 2020, reveals multiple

emails and telephone calls between Jane Doe 2 and Gladimir Thomas.  During a January 7,

2020 call, Jane Doe 2 and Gladimir Thomas discuss, among other things, money that she has

sent to his commissary.  The phone number being used by Jane Doe 2 is a telephone number

ending in 9379.

      26.     A review of a law enforcement database shows that between August 10, 2019

and September 4, 2019, Jane Doe 2's phone number ending in 9379 was used in 21

advertisements on multiple websites, including MegaPersonal.com, CityXGuide.com and

SkiptheGames.com, with the most recent advertisement posted on September 4, 2019.  The

advertisements contain multiple photographs of scantily clad women in provocative poses, as

well as text explicitly or implicitly, advertising their services.  For example, an advertisement

posted September 4, 2019 on MegaPersonal.com, says, "Busty spoiled COXO

DIAMOND.DIOR hi daddy let's play."  Based on my training and experience and

involvement in the investigation, I believe that these advertisements are for prostitution services and that during this period Jane Doe 2 was working as a prostitute for Gladimir Thomas.

27.     Given my training and experience and involvement in this investigation, I am aware that individuals engaged in sex trafficking often use their electronic devices to communicate through text, applications and by phone with their other co-conspirators and customers.  I am also aware that sex traffickers frequently use classified advertising websites—which can be accessed by a smart phone such as the Subject Devices—to post photographs of sex trafficking victims in an effort to solicit customers.

28.     The Subject Devices are currently in the lawful custody and storage of the FBI in the Eastern District of New York.  In my training and experience, I know that the Subject Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Devices first came into the possession of the NYPD.

## TECHNICAL TERMS

29.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually

contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio,

video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30.     Based on my training, experience, and research, I know that the Subject Devices have the capability to serve as a wireless telephone, digital camera, and portable media player.  In my training and experience, examining data stored on a device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.     Based on my knowledge, training, and experience, I know that the Subject Devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Subject Devices. This information can sometimes be recovered with forensics tools.

32.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence may be on the Subject Devices because:

        a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the Subject Devices.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how an electronic device was used, the purpose of its use, who used it, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to conduct sex trafficking, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime

15

because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit crimes of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

33.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that may expose many parts of the Subject Devices to human inspection to determine whether it is evidence described by the warrant.

34.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

S/ Kyle Cappello
_____
KYLE CAPPELLO
Federal Bureau of Investigation

Subscribed and sworn to before me on February 13, 2020

S/ Lois Bloom
_____
HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## <u>ATTACHMENT A</u>

The property to be searched consists of the following: (1) A BLU PRODUCTS INC. CELLULAR TELEPHONE MODEL V5 ("Subject Device 1"), (2) A BLACK IPHONE WITH DARK BLUE CASE ("Subject Device 2") and (3) AN ORANGE IPHONE WITH A CRACKED SCREEN ("Subject Device 3") (collectively, the "Subject Devices"), as depicted in the following photographs:

Subject Device 1:

 

Subject Device 2:

 

Subject Device 3:

 

The Subject Devices are currently located in the custody of the Federal Bureau of Investigation in the Eastern District of New York.

This warrant authorizes the forensic examination of the Subject Devices for the purpose of identifying the electronically stored information described in Attachment B.

2

## ATTACHMENT B

1.      All records on the Subject Devices described in Attachment A that relate to violations of sex trafficking, in violation of Title 18, United States Code, Section 1591, sex trafficking conspiracy, in violation of Title 18, United States Code, Section 1594(c), promotion of prostitution, in violation of Title 18, United States Code, Section 1952(a)(3), and drug trafficking, in violation of Title 21, United States Code, 841 (the "Subject Offenses"), have been committed by Gladimir Thomas and Ronald Thomas, including:

      a. names and telephone numbers, as well as the contents of all call logs, contact lists, text messages, e-mails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts and messages, Internet activity (including browser history, web page logs, and search terms entered by the user), application data, and other electronic media;

      b. communications regarding the commission of the Subject Offenses;

2.      Evidence of user attribution showing who used or owned the Subject Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet Protocol address to communicate with the co-conspirators, including records of Internet Protocol addresses used.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.